EDWARD M. PINSOF, Plaintiff-Appellant, *v.* OSCAR PINSOF *et al.*,
Defendants-Appellees.

First District (2nd Division)  No. 80-3110

Opinion filed June 29, 1982.

Arvey, Hodes, Costello & Burman, of Chicago (Nathan M. Cohen and Donald F. Spak, of counsel), for appellant.

Foran, Wiss & Schultz, of Chicago (Richard G. Schultz, Nicholas J. Etten, and Stephen C. Voris, of counsel), for appellees Oscar Pinsof and Philip Pinsof.

Antonow & Fink, of Chicago (William I. Goldberg and Alan P. Solow, of counsel), for appellee Sipi Metals Corp.

JUSTICE PERLIN delivered the opinion of the court:

Plaintiff, Edward Pinsof (Edward), brought suit against defendants, Sipi Metals Corporation (Sipi) and Oscar and Philip Pinsof (Pinsof defendants), seeking both equitable relief and money damages for breach of an alleged lifetime employment contract and for tortious interference with such contract. The trial court granted defendants' motion to dismiss Edward's complaint on the ground that it failed to state a cause of action and also granted Edward leave to file an amended complaint. Edward elected to stand upon his original complaint, however, and thereafter the order of dismissal was made final. Edward appeals raising for our review the issue of whether his complaint states a cause of action.

For the reasons which follow we affirm.

Sipi is owned and operated by the three Pinsof brothers, Edward, Oscar and Philip and their immediate families. Each of the brothers is an officer and director of the corporation, and Edward and his children collectively own in excess of one-third of the outstanding shares of Sipi's common stock. On June 12, 1980, after 48 years of service to the company, Edward was removed by resolution of the Board of Directors from his positions as executive vice-president and assistant secretary. On August 1, 1980, he filed a three count complaint against Sipi and the Pinsof defendants.

Count I alleged that it was the intention of the three brothers that each of them would be employed by Sipi for life. To support such an intention, Edward asserted that on December 16, 1963, the parties to this litigation executed two documents: (1) a stock purchase agreement and (2) a death benefit agreement.[1] Count I concluded that under these

---

[1] Edward refers to this document as an "employment agreement" while defendants call it an "annuity agreement." The document itself is entitled "Agreement." For the sake of clarity we will refer to it as a death benefit agreement.

agreements defendants were powerless to terminate Edward's employment and prayed for a judgment declaring that the documents executed on December 16 gave him employment for life; that the resolution of the board of directors of Sipi terminating Edward's employment is of no force and effect; and that Edward be restored to his employment with all pay and benefits retroactive to the date of his termination.

The stock purchase agreement, attached to the complaint as Exhibit A, provides that if a Sipi shareholder intends to sell his Sipi shares to one other than his descendant, the seller must first offer to sell the stock to Sipi. This document further provides that when a shareholder offers his stock to Sipi, the corporation "shall purchase all such shares to the extent permitted by law." The agreement also establishes both the method and the formula for determining the price which the corporation must pay for the shareholder's stock and the procedure for effectuating its sale.

The death benefit agreement, attached to the complaint as Exhibit B, provides in pertinent part:

## "A G R E E M E N T

THIS AGREEMENT made and entered into this 16th day of December, 1963, at Chicago, Illinois, by and between SIPI METALS CORP., an Illinois corporation (hereinafter designated as 'Employer') and EDWARD M. PINSOF (hereinafter designated as 'Employee').

## W I T N E S S E T H:

WHEREAS, Employee is employed by Employer and Employee has rendered and is now rendering valuable services for Employer; and

WHEREAS, it is deemed to be in the mutual best interests of the parties that such employment be continued in the future;

NOW, THEREFORE, in consideration of the past services rendered by Employee to Employer, and in consideration of Employee's future services, the parties agree as follows:

1. Commencing on the first day of the month next succeeding Employee's death and at monthly intervals thereafter, Employer will continue to pay 50% of Employee's salary as of the date of Employee's death, to the individuals hereinafter designated, until a total of twenty-four (24) such payments has been made.

\* \* \*

4. The payments hereunder are provided for the sole benefit of

---

We note also that at oral argument Edward conceded that each of the brothers executed both a stock purchase agreement and a death benefit agreement.

Employee's wife, and Employee shall have no right or interest therein.

5. Anything herein contained to the contrary notwithstanding, no payments provided hereunder shall be made unless Employee is employed by Employer at the date of Employee's death."

Count II prayed for Edward's restoration to his positions as executive vice-president and assistant secretary and for an injunction prohibiting defendants from interfering with his employment under his "Employment Agreement of December 16, 1963." Count II incorporated those portions of count I which alleged the lifetime employment contract predicated upon the stock purchase agreement and the death benefit agreement. Edward asserted that his employment was an integral element of his stock ownership, and because Sipi was engaged in the business of trading and selling precious and common metals, a business fraught with risk, the exercise of his judgment in Sipi's daily operations was vital to the protection of his interest in the company.

Count III sought $500,000 compensatory damages and $200,000 punitive damages and also incorporated the allegations of count I which asserted the existence of a lifetime employment contract. Edward averred that while negotiating with his brothers for the sale of his Sipi stock, the Pinsof defendants conspired between themselves to terminate his employment "so as to impose upon [Edward] terms and conditions advantageous to defendants and onerous and prejudicial to [Edward] in connection with the proposed purchase of [Edward's] shares of Sipi."

Edward contends that the trial court erred in dismissing his complaint. In this court he maintains that the allegations in counts I and II of his complaint state a cause of action for either breach of a lifetime employment contract or wrongful discharge of an "at will" employee.

■■ In deciding whether Edward's complaint states a cause of action we must accept as true all facts properly pleaded as well as all reasonable inferences that can be drawn from such facts. (*Ford v. University of Illinois Board of Trustees* (1977), 55 Ill. App. 3d 744, 371 N.E.2d 173.) Of course, conclusions unsupported by allegations of fact should be disregarded. (*Kuch & Watson, Inc. v. Woodman* (1975), 29 Ill. App. 3d 638, 331 N.E.2d 350.) Exhibits attached to the complaint become part of the pleadings, and facts stated in such exhibits are considered as having been alleged in the complaint. (*Ford.*) Where, as here, the exhibits form the basis of the complaint, the exhibits control, and a motion to dismiss does not admit allegations in the complaint which are in conflict with facts disclosed by the exhibits. *Sangamon County Fair & Agricultural Association v. Stanard* (1956), 9 Ill. 2d 267, 137 N.E.2d 487; *Fowley v. Braden* (1954), 4 Ill. 2d 355, 122 N.E.2d 559.

Edward's first argument in support of his contention that counts I and

II state a cause of action for breach of his alleged lifetime employment contract is that the death benefit agreement, standing alone, manifests an intention by the parties to grant him lifetime employment, and when viewed in the context of the "surrounding circumstances," the death benefit agreement constitutes such a contract.

We are not persuaded by Edward's interpretation of the parties' intention in executing the death benefit agreement. He concedes that the document lacks provisions one might expect to find in a written employment agreement and relies instead on language in the introductory paragraphs which states that the document was executed in part "in consideration of Employee's [Edward's] future services." In our opinion this language does not evince an intention to enter into a commitment for lifetime employment. At most it is indicative of the reasonable anticipation of the parties that Edward's employment might continue for some unspecified period in the future.

■■ Reading beyond the introductory paragraphs we find that paragraph five of the death benefit agreement appears to rebut Edward's contention here. This paragraph sets forth an express condition precedent that "no payments provided hereunder shall be made *unless* Employee is employed by Employer at the date of Employee's death." (Emphasis added.) This provision renders the payment of the death benefit contingent upon Edward's being in the employ of Sipi at the time of his death. Certainly paragraph five contemplates the possibility that Edward might not be employed by Sipi at the date of his death and, in our view, it refutes Edward's argument that the death benefit agreement manifests the parties' intention to contract for lifetime employment.

Edward next contends that the parties' intention to contract for lifetime employment was further demonstrated by the simultaneous execution of the death benefit and stock purchase agreements. He asserts that his agreement to place restraints on the disposition of his shares of stock supplied "additional consideration" in return for a lifetime employment contract.

■■ Edward's attempt to impute an intention to contract for lifetime employment into the execution of a stock purchase agreement seems farfetched. This type of agreement is common among shareholders of close corporations such as Sipi. They serve many purposes including that of providing a market for the seller (in this case Edward) of shares, and they preserve ownership of the corporation within the family. This document is, in our opinion, unambiguous, and it does not purport to relate to an obligation for lifetime employment. Accordingly, we find that execution of the stock purchase agreement does not constitute evidence of the parties' intention to contract for lifetime employment.

Edward next urges us to construe his employment relationship as one

terminable "at will," and he argues that, if liberally construed, his complaint states a cause of action for the wrongful discharge of an at-will employee.

■■ While it is well established that "[n]o pleading is bad in substance which contains such information as reasonably informs the opposite party of the nature of the claim or defense which he is called upon to meet" (*Palmateer v. International Harvester Co.* (1981), 85 Ill. 2d 124, 134, 421 N.E.2d 876), our analysis of the complaint leads us to conclude that none of the counts "reasonably informs" defendants of the *nature* of a claim based on an at will employment relationship. In fact, the nature of Edward's claim, as embodied in his complaint, is the opposite of an at-will employment relationship. An at-will employee is terminable at any time. Edward alleges, however, that under this lifetime employment agreement, the defendants are powerless to terminate his employment. Such an allegation is wholly inconsistent with a cause of action based on an at-will employment relationship. As Edward points out, to withstand a motion to dismiss, a complaint need only minimally allege facts which set forth the essential elements of the cause of action. But Edward's failure to do so cannot be remedied by a liberal construction of the pleading or by argument. (*Donehue v. Duvall* (1968), 41 Ill. 2d 377, 381, 243 N.E.2d 222; *Fanning v. LeMay* (1967), 38 Ill. 2d 209, 212, 230 N.E.2d 183.) At minimum it would seem that a cause of action for the wrongful discharge of an at-will employee should contain an allegation that the employment relationship is in fact one at will. Since the complaint here did not contain such an allegation, we hold that Edward's complaint fails to state a cause of action for the wrongful discharge of an at-will employee.

Edward devotes a substantial portion of his brief to argument on the merits of his wrongful discharge claim allegedly set forth in count II. He argues in the alternative that either the tort of "retaliatory discharge" should be expanded to encompass the facts of the instant case or that we should impose a restriction on an employer's right to discharge an at-will employee: namely, that we imply a contractual duty not to terminate at will employees unless in good faith. Before the merits of a cause can be considered, a complaint must state a cause of action. Since we find that counts I and II of the complaint fail to state a cause of action, the merits of this portion of Edward's case, although capably argued, are not before us for consideration. See *Tru-Link Fence Co. v. Reuben H. Donnelley Corp.* (1982), 104 Ill. App. 3d 745, 432 N.E.2d 1188.

Edward's final contention is that his count III establishes a prima facie case for tortious interference with his employment contract with Sipi. We disagree.

The theory of the tort of interference is that the law draws a line beyond which no member of the community may go in intentionally

intermeddling with the business affairs of others. (*City of Rock Falls v. Chicago Title & Trust Co.* (1973), 13 Ill. App. 3d 359, 362, 300 N.E.2d 331.) In order to state a cause of action for the tort of interference, a plaintiff must allege:

> "the existence of a valid business relationship (not necessarily evidenced by an enforceable-contract) or expectancy; knowledge of the relationship or expectancy on the part of the interferer; an intentional interference inducing or causing a breach or termination of the relationship or expectancy; and resultant damage to the party whose relationship or expectancy has been disrupted." 13 Ill. App. 3d 359, 363.

The thrust of count III of Edward's complaint is that the Pinsof defendants "conspired and agreed to terminate plaintiff's employment" even though "defendants full well knew that plaintiff had an agreement for lifetime employment with Sipi." The alleged purpose of the conspiracy was "to bring pressure upon [Edward] so as to impose upon [him] terms and conditions advantageous to defendants and onerous and prejudicial to [Edward] in connection with the proposed purchase of [his] shares of Sipi."

■■ To state a cause of action for tortious interference, it was incumbent upon Edward to allege in his complaint some valid business relationship between himself and Sipi (*City of Rock Falls*). The only business relationship he so alleged was that of lifetime employment predicated upon a written contract. Since we have already determined that the exhibits attached to the complaint negate the existence of such a contract, we conclude that count III lacks an allegation of a cognizable business relationship for purposes of tortious interference.

We also note that the stock purpose agreement rebuts Edward's assertion that the Pinsof defendants terminated his employment so as to undermine the sale price of his stock. Paragraph 4(a)[2] of the stock purchase agreement provides that no original stockholder of Sipi, including Edward, may sell or transfer his Sipi stock (with certain exceptions not relevant here) unless all of that shareholder's stock is first offered for sale to the corporation. Whenever a shareholder offers his stock to Sipi, para-

---

[2] Paragraph 4(a) provides as follows:

"4. *Lifetime Transfers by Original Shareholders.*

(a) Subject to the provisions of subparagraph 4(b), paragraph 8 and subparagraph 9(b)(ii), no Original Shareholder during his lifetime shall voluntarily sell, transfer, assign or encumber his Sipi shares or any part thereof, nor shall any involuntary transfer during his lifetime be effective for any purpose, including, but not limited to a transfer by judicial order, legal process, execution, attachment, enforcement of a pledge, trust or encumbrance or sale under any of them, unless all Sipi shares owned by such Original Shareholder shall first have been offered for sale to the Corporation in the manner hereinafter provided."

graph 4(b)[3] requires Sipi to purchase all of the stock offered by that shareholder. The price which Sipi must pay for a shareholder's stock is independently established in accordance with a predetermined formula.

■■ It is apparent from this agreement that if Edward wished to sell his stock, he must offer it to the corporation, which within 10 days must purchase all such shares. Under such an agreement the Pinsof defendants would be powerless to influence the purchase price of Edward's stock. Accordingly, Edward's allegation in his complaint that the Pinsof defendants conspired to undermine the sale price of his stock is also negated by his exhibits, and we find, therefore, that count III was properly dismissed.

For the foregoing reasons the order of the circuit court of Cook County is affirmed.

Affirmed.

STAMOS, P. J., and DOWNING, J., concur.

---

[3] Paragraph 4(b) provides as follows:

"(b) An Original Shareholder may at any time offer all, but not less than all, of his Sipi shares for sale to the Corporation at a price equal to 100% of the book value of such shares. Wherever used in this Agreement, the term 'book value' shall be defined as provided in paragraph 12. Such offer shall be made to the Corporation in writing with a copy to the Escrowee. The purchase price for such shares shall be payable in the manner provided in paragraph 9. Within ten (10) days after receipt of such offer, the Corporation shall purchase all such shares to the extent permitted by law."